UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JENNIFER M. SMITH, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:19-CV-03288-NCC |
| KILOLO KIJAKAZI,[1] | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Kilolo Kijakazi's Motion for Summary Judgment (Doc. 49). The motion is fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 5). For the following reasons, Defendant's Motion will be **GRANTED**.

**I. Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and [] the moving party is entitled to [] judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is

nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248).  In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the non-moving party.  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).  The evidence is not weighed and no credibility determinations are made.  *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

When cross motions for summary judgment are filed, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law.  *Husinga v. Federal-Mogul Ignition Co.*, 519 F.Supp.2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  "The usual Rule 56 standard of review applies to cross-motions for summary judgment."  *Int'l Brotherhood of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).  In determining the appropriateness of summary judgment, "the relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

automatically substituted as a party. Fed. R. Civ. P. 25(d).

2

party must prevail as a matter of law.'" *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52)).

## II. Background

In 2019, Plaintiff Jennifer M. Smith ("Smith") filed an employment discrimination action against Defendant Andrew M. Saul, then Commissioner of the Social Security Administration ("the Agency") (Doc. 1). Smith later filed an amended complaint in which she raised claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., the Whistleblower Protection Act, and the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002. The Court dismissed most of Smith's claims as unexhausted and untimely, but allowed a single claim of retaliation under Title VII to proceed (Doc. 38). Defendant now moves for summary judgment on the retaliation claim. The undisputed facts are as follows:[2]

Smith began working for the Agency on August 8, 2004. She worked as a Claims Specialist in the Agency's Union, Missouri field office until she was removed from service on September 27, 2017. Smith worked 30 hours per week and was assigned a workload representing 75 percent of a full-time employee's workload. During the relevant time period, Operations Supervisor Jeffrey Watson was Smith's first-line supervisor at the Union Field Office. District Manager Le'ah Gruber was Watson's first-line supervisor and Smith's second-line supervisor, and Kathleen Karen Bailey, District Manager at the St. Louis West County Field Office, was Gruber's supervisor, Watson's second-line supervisor, and Smith's third-line

---

[2] The facts are taken from Defendant's Statement of Uncontroverted Material Facts (Doc. 51), Smith's Response (Doc. 54), and Defendant's Reply (Doc. 57).

3

supervisor.

Smith testified her primary responsibility as a claims specialist was to adjudicate disability claims.  Her other duties included: telephone and reception coverage; conducting interviews with applicants to determine eligibility; assisting the public and claimants by explaining options, rights, and responsibilities; examining claimants' evidence to evaluate acceptability for benefit entitlement; responding to inquiries from beneficiaries, the public, or SSA staff; making changes to beneficiary records and claims; assisting people in filing administrative appeals; and investigating by mail, email, or telephone to develop accurate relevant factual information.  A claims specialist must be able to accurately and timely perform her job duties.  The Performance Assessment and Communication System Plan (the "Plan") defines the claims specialist position's critical elements and provides the standards and expectations on which performance is reviewed.  The Plan is provided to claims specialists annually at the beginning of the appraisal year.  Timeliness standards are issued at the beginning of each fiscal year, are applicable Agency-wide, and are provided to claims specialists during a Plan expectations meeting near the beginning of the appraisal year.  Smith was informed and aware of the critical elements of her position and the performance standards by which she would be judged.

Watson first became concerned with Smith's performance in 2013 when she was behind on her work at the time she left for extended leave in March 2013.  When she returned from leave, all of her backlogged work had been completed by her co-workers.  However, Smith again fell behind.  In 2014, Watson considered placing Smith on a Performance Assistance ("PA") plan due to her continued issues with timeliness, but did not because Smith went on another extended

4

period of leave.

A plan such as a PA plan is usually a 30-day personalized plan to help marginal or failing employees improve their performance. An Opportunity to Perform Successfully ("OPS") plan is usually a 120-day personalized plan for employees who were unsuccessful with their PA plan. It includes ongoing discussions with employees and documented work reviews. If an employee is unable to successfully complete the OPS plan, then the employee may be reassigned, reduced in grade, or terminated.

While she was out on leave, her coworkers again completed her overdue work tasks without issue in addition to their normal job duties. When Smith returned in July 2015, she again fell behind, compiling another substantial backlog of overdue assignments. In June 2015, during a performance discussion, management discussed with Smith her large number of old, overdue job tasks that she should have completed with minimal effort. In April 2016, a desk audit reviewed nine files, seven of which included incomplete and overdue job actions. A desk audit is a review of an employee's work, outside of a formal appraisal, based on an analysis of a portion of the employee's files.

During a July 2015 performance discussion, Watson told Smith he was concerned about her history of not performing her duties and she needed to improve her workload management skills to complete her tasks in a timely fashion. Smith's performance problems continued. In January 2016, Watson discussed with Gruber his plan to place Smith on a PA plan. He did not immediately place Smith on the plan because he learned he would be out of the office on a detail from March through June and would not be present to monitor and assist Smith. When Watson returned, Smith's problems continued. At her September 2016 desk audit, Smith agreed she was

far behind on her work tasks.  She stated that while she normally had difficulty completing her work in a timely manner, in September 2016, it may have been worse than normal.

In November 2016, during Smith's performance appraisal, Watson again discussed with Smith her performance issues and reviewed with her the data showing her poor time management.  She was given her 2016 performance appraisal which referenced the issues with time management, task prioritization, and completion of assignments within established timeframes.  On November 22nd, Watson placed Smith on a PA plan that lasted until January 5, 2017, because of his longstanding concerns about her performance in critical elements of her position.  Smith testified that although she had been trained and given suggestions on time management and how to manage her workload, she always had difficulty staying current with her workload.  She struggled with accuracy and performing her tasks in a punctual and timely manner.  Smith agrees she had been given desk audits and performance appraisals for years documenting management's concerns with the quality and timeliness of her work.  The PA plan told Smith her performance in the critical element of "Achieves Business Results" was unsatisfactory.  It provided specific supporting examples and reminded Smith of the expectations she needed to meet to successfully complete the PA plan.

During the PA plan, Smith was assigned a mentor to whom she could ask questions at any time.  She was allowed to take a half-day to observe her mentor's good workload management practices and she was given two full workdays to work on her backlog and organization skills without interruption.  She was also informed she could request additional assistance if needed.  Smith chose not to spend time with her mentor, stating it was unnecessary because "[t]here wasn't anything that [the mentor] could tell [Smith] that [she] didn't already

6

know."

During the plan, the critical elements, standards, and expectations of her job were frequently communicated to Smith.  After the initial meeting putting Smith on the plan, her poor performance continued including failing to complete an overdue task specifically noted in the plan and in two reminder emails of items needing immediate action.  Smith had not completed this overdue item on January 5, 2017, when Watson sent her another email reminding her of this task, along with 62 other pending overdue items.

Smith testified that throughout her employment, she received emails on a weekly basis from supervisors about overdue tasks.  For example, Smith failed to act after Gruber emailed her about an erroneous entry she made in the computer system.  Gruber asked for Smith to fix the error three times, but Smith never did.  Another employee eventually fixed it.  Smith's problems with her workload affected applicants who were attempting to obtain Social Security disability benefits or modifications to their benefits.  Smith was not successful in her PA plan despite extensive assistance, training, technical advice, guidance, and direction.  She never managed or organized her workload, did not complete the backlogged work, failed to respond to her supervisors' direct requests concerning specific errors or overdue assignments, and never performed the requested tasks.  Smith agreed she did not successfully complete the plan.

Watson determined Smith needed an OPS plan.  The goal of the OPS plan was to help Smith improve her performance in the critical element of Achieves Business Results.  The requirements for success were fully explained to Smith.  She began the plan on January 10, 2017, and concluded it in May 2017.  Smith received extensive assistance, training, technical advice, mentoring, guidance, and direction to help her meet the critical elements, standards, and

7

expectations of her position.  This assistance included a weekly meeting with a mentor to discuss best practices, policy, and procedures; priority workload emails illustrating which tasks were of higher priority; additional time management assistance; granular progress review meetings every 30 days in which her supervisor included specific examples to illustrate proper protocol and for use as illustrations for future work assignments; memos summarizing the meetings to use for future guidance; and reminder emails when tasks were not completed.  Smith was also provided weekly meetings to review pending and completed work tasks, action lists, proper documentation, and strategies to implement effective work management, and a mentor to answer questions as needed.  Smith was allowed to first submit her claims to her mentor for review and for written feedback on each claim.

To ensure Smith had every tool available for her to be successful, management asked Smith for suggestions and granted requests that were relevant to her deficient performance areas. Smith asked to be provided additional training on time management skills. Watson then found three relevant training courses, scheduled Smith's participation at times when she could be uninterrupted, and placed the times on the office calendar.  Smith forgot to watch one course, and took leave when another was scheduled.  She ultimately only viewed one of the sessions.

Despite this assistance, Smith consistently failed to perform her work in a timely manner in accordance with Agency guidelines.  She failed to follow through on commitments, ensure her tasks were done timely and accurately, properly manage her time, or prioritize her workload to meet customer and Agency expectations and goals.  In March, Smith emailed her Union acknowledging her performance had not improved and she was still far behind.

At the conclusion of the OPS plan, Smith's performance remained unsuccessful.  The

Agency determined Smith could not manage her workload or perform the basic requirements of her position. Smith agreed she continued to be unsuccessful during and after the OPS plan. She does not dispute the Agency provided her with a reasonable opportunity to improve her performance through both the PA and the OPS plans. Even after the OPS plan concluded, the Agency continued to provide Smith with the assistance she received during the OPS plan. The Agency considered if there were other positions to which Smith could be reassigned, but determined she did not qualify for any other positions.

Watson independently decided Smith's performance required the PA and OPS plans. Neither of his supervisors, Gruber or Bailey, directed him to place Smith on the plans. Watson also decided to propose Smith's removal, although he kept Gruber informed of Smith's deficiencies and actions to assist Smith in meeting her goals. Watson and Gruber informed Bailey of the PA and OPS plans and then, subsequently, Smith's removal, but Bailey was not involved in the decisions.

Watson issued a Notice of Proposed Removal on August 28, 2017. The Notice included 500 pages of documentation supporting the determination that Smith's unsatisfactory performance necessitated her removal. Gruber determined the record supported Watson's assessment. Smith was removed from service on September 28, 2017. Until her position was filled, the remaining employees were able to take on the additional work that would have been assigned to Smith, while also addressing her overdue work. The general performance statistics in the office improved after Smith's departure.

Smith bases her retaliation claim on her involvement in a co-worker's 2016 hostile work environment investigation. Smith's alleged evidence of retaliation is the timing of her placement

9

on the PA and OPS Plans, which occurred shortly after she participated in the investigation. Smith testified everyone in the office was interviewed in May 2016, she submitted a statement in July, and in August, she voiced her unhappiness with the outcome of the investigation to Bailey. Smith assumed Bailey was aware of the investigation.

Bailey visited the Union Field Office approximately twice each year for one to two days at a time. She rarely interacted with Smith beyond the routine twice-a-year office meetings during her visits. Smith testified she met with Bailey on a day Bailey was in the Union Office, and she told Bailey she was considering leaving due to the workload and the results of the investigation. Smith testified Bailey responded by giving her tips on how to better handle the workload. According to Smith, Bailey immediately went into Gruber's office and met with Gruber and Watson, and Bailey "probably suggested" then that Smith be placed on a PA plan. Smith could not see or hear anything that was said during the meeting between Bailey, Watson, and Gruber. Smith has not seen any documents memorializing what happened during the meeting.

Smith also testified she assumed Watson and Gruber saw a document she submitted to her Union complaining about management, but she has no evidence this occurred. Bailey was not involved with the hostile work investigation and has no recollection of speaking with Smith about the investigation or Smith's performance. While Bailey was aware of the investigation, she did not know who was interviewed, that Smith was interviewed, or anything that was said during the interviews. Bailey was not interviewed and had nothing to do with the investigation. Bailey did not have a meeting with Watson or Gruber at which they discussed Smith's participation in the investigation, nor did she direct or request that Watson or Gruber place Smith

10

on the PA and OPS plans, nor did she have any involvement in the decision to remove Smith.

Neither Watson, Gruber, nor Bailey were aware of any Equal Employment Opportunity ("EEO") complaints by Smith and they had no direct knowledge of her involvement in the hostile work investigation.  In July 2016, Watson received employee witness statements that were part of the investigation, including a statement from Smith.  These statements were in sealed envelopes and Watson did not review them or have any knowledge of the contents of the statements.  While many employees participated in the investigation, only Smith was placed on a PA plan.

On May 25, 2017, Smith requested EEO counseling.  The EEO Counselor attempted, but was unable to resolve, Smith's allegations.  The counselor issued the Final EEO Counseling Report and Notice of Right to File a Formal Complaint of Discrimination on August 23, 2017.  Twelve days later, the Agency received Smith's formal complaint pursuant to Title VII, which was accepted by Defendant on September 12, 2017.  Smith alleged she had been retaliated against for prior protected conduct when, in May 2017, she received a low rating on her performance appraisal during her OPS period.  A formal investigation of Smith's complaint occurred and in January 2018, the Report of Investigation was sent to Smith.  She received it in February 2018.

The Report informed Smith of the deadline for requesting a hearing before the Equal Employment Opportunity Commission ("EEOC"), and informed her if she did not request a hearing within that time, the Agency would issue its decision without a hearing.  Smith never requested a hearing and in April 2018, the Final Agency Decision was issued.  When Smith was ultimately removed from service, she challenged the removal, and it was fully litigated.  An

11

administrative law judge issued an Initial Decision rejecting Smith's claims, and the Merit Systems Protection Board issued a final decision incorporating the Initial Decision in January 2019.  Smith did not seek review of that decision.

### III. Discussion

In her Amended Complaint, Smith alleges after she initiated and participated in a hostile work environment investigation, she was placed on performance plans and had her work scrutinized which eventually resulted in her termination.  Defendant moves for summary judgment arguing there is no evidence of retaliation and Defendant has articulated legitimate, non-retaliatory reasons for Smith's termination.

Title VII prohibits employers from retaliating against employees who oppose unlawful discrimination.  42 U.S.C. § 2000e-3(a).  Similar to a discrimination claim under Title VII, a retaliation allegation follows the familiar *McDonnell Douglas*[3] burden-shifting framework when a plaintiff does not have direct evidence to support the claims.  *Watson v. McDonough*, 996 F.3d 850, 854 (8th Cir. 2021); *Kempf v. Hennepin Cnty.*, 987 F.3d 1192, 1196 (8th Cir. 2021).  To establish a prima facie case of retaliation, Smith must prove (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) but for her protected activity, Defendant would not have taken the action against her.  *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013).  Once proven, the burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse action.  *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015).  If Defendant manages to do so, then Smith carries the burden to put forward evidence of pretext.  *Id*.

Defendant does not challenge that Smith engaged in a protective activity or that she suffered a materially adverse employment action. The issue is whether Smith can prove that but for her participation in the hostile work investigation, the Agency would not have terminated her. Title VII retaliation claims require but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. The only evidence Smith has to support her claim of retaliation is the timing of her participation in the investigation and subsequent placement in the PA and OPS plans. Smith testified everyone in the office was interviewed in May 2016 for the investigation, she submitted a statement in July 2016, and spoke with Bailey about the investigation in August 2016. Then in November 2016, Watson placed Smith on the PA plan. In January 2017, Watson placed Smith on the OPS plan and terminated her in September 2017.

"Generally, . . . more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." *Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1065 (8th Cir. 2020) (quoting *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir. 2000)). The amount of time that elapsed between the alleged protected activities here and the date of Smith's placement on the performance plans and then termination does not support an inference of a causal connection. *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months."). Watson did not place Smith on a performance plan until November 2016, several months after

---

[3] *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

13

her participation in the hostile work environment investigation. Her termination did not occur until September 2017. Because of the several months between the protected activity and the adverse employment action, the Court cannot drawn an inference of a causal connection between Smith's participation in the investigation and her placement on the plans and termination.

  Smith also asserts that after she spoke with Bailey about her unhappiness with the results of the investigation, Watson, Gruber, and Bailey had a meeting where they discussed Smith. However, she provides no support for this assertion. She was not in the meeting room, could not see what occurred in the meeting, and could not hear the conversation. She has no evidence any meeting between Watson, Gruber, and Bailey was about her. With so little evidence to support her claim, Smith has not established a prima facie case of retaliation. She has not shown that but-for her participation in the hostile work environment investigation, she would not have been placed on the PA and OPS plans and eventually terminated. Because she has not established a prima facie of retaliation, the burden does not shift to Defendant to establish a non-retaliatory reason for Smith's termination.

  With that said, even if Smith had established a prima facie case of retaliation, Defendant has established through undisputed facts a legitimate, non-retaliatory reason for her termination. Since 2013, Watson has been concerned about Smith's performance. Desk audits in 2015 and 2016 routinely showed incomplete and overdue job actions. When taking extended leave, Smith's co-workers had to catch up on all of the work Smith had not completed. Smith admits she had difficulty completing her work in a timely manner. Despite being given ample resources and training throughout the PA and OPS plans, Smith was still unable to complete her tasks accurately and on-time. She did not take advantage of the time given to speak with her mentor

14

and did not complete the training courses provided to her.  Smith did not successfully complete either the PA or the OPS plan.  She did not do her job satisfactorily.

Smith provides no evidence to counter these facts and admitted to performing her job unsatisfactorily.  To succeed in her claim, and proceed to trial, Smith must both discredit the Agency's explanation for her termination and show the circumstances permit drawing a reasonable inference the real reason for her termination was retaliation.  *Kempf*, 987 F.3d at 1196.  She has not done so.  For these reasons, the Court grants Defendant's motion for summary judgment.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Kilolo Kijakazi's Motion for Summary Judgment (Doc. 49) is **GRANTED** and this matter is **DISMISSED, with prejudice**.

A separate judgment will accompany this Memorandum and Order.

Dated this 19th day of April, 2022.

　　　　　　　　　　　　　　　　　　 /s/ Noelle C. Collins　　　　　　　
　　　　　　　　　　　　　　　　　NOELLE C. COLLINS
　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE